**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-7118

K.C. LANGFORD,

Petitioner – Appellee,

v.

WARDEN DONNIE STONEBREAKER, Warden, Evans Correctional Institution,

Respondent – Appellant.

Appeal from the United States District Court for the District of South Carolina, at Beaufort. Donald C. Coggins, Jr., District Judge.  (9:20-cv-01298-DCC)

Argued:  October 21, 2025                      Decided:  July 2, 2026

Before DIAZ, Chief Judge, and THACKER and RUSHING, Circuit Judges.

Reversed by published opinion.  Judge Rushing wrote the opinion, in which Chief Judge Diaz and Judge Thacker joined.

**ARGUED:**  Tommy Evans, Jr., Richard Brandon Larrabee, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellant.  Ernest Charles Grose, Jr., THE GROSE LAW FIRM, LLC, Greenwood, South Carolina, for Appellee.  **ON BRIEF:**  Alan Wilson, Attorney General, Donald J. Zelenka, Deputy Attorney General, Melody J. Brown, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellant.

RUSHING, Circuit Judge:

A South Carolina jury convicted K.C. Langford of criminal conspiracy, armed robbery, first-degree burglary, and kidnapping. The South Carolina Supreme Court affirmed Langford's convictions, and a state court denied his subsequent application for postconviction relief. Langford then sought relief in federal court, raising arguments that the state courts had already rejected about his speedy trial right and ineffective assistance of counsel. The federal district court granted Langford the writ of habeas corpus on both grounds and ordered his release from state custody. We reverse.

## I.

### A.

We begin with the facts as recounted by the South Carolina Supreme Court.

> On August 14, 2008, Ji Quing Chen, along with his son, Li Guan Xin, and wife, Li Ai Ming, left the Chinese restaurant they own in Johnston, South Carolina, shortly after 10:00 p.m. and headed home. With them was a black bag containing the day's earnings. When they arrived home, Ji Quing stayed outside to water some plants while his wife and son entered the house. As he was tending to his garden, three men wearing masks came out from the bushes, forced him to the ground, hit him, and took his wallet. Concerned that his father had not yet come inside, Li Guan stepped out onto the porch to check on him. Once he was outside, the men forced Li Guan to the ground and asked where the restaurant's money was. He told them it was in the house, and one of the men went inside to find it. That man returned shortly with the black bag, and all three of them ran off. Because the men wore masks, the victims were unable to provide a useful description to law enforcement. Moreover, it does not appear the men left any forensic evidence during the commission of these crimes.

*State v. Langford*, 735 S.E.2d 471, 475 (S.C. 2012).

A few weeks after the robbery, a man named Joseph Patrick Stevens contacted Investigator Roosevelt Young of the Edgefield County Sheriff's Department. Stevens

2

volunteered information about the crime, which led to seventeen-year-old Alvin Phillips. Investigators met with Alvin, who implicated himself, his cousin Bryan Phillips, and Langford in the robbery. Langford was arrested on October 3, 2008, and ultimately indicted for criminal conspiracy, first-degree burglary, armed robbery, and kidnapping. His co-defendant, Bryan, was indicted on the same charges, as was Alvin, who was also charged with assault and battery with intent to kill and possession of a weapon during the commission of a violent crime.

In January 2010, Bryan's counsel filed a motion to dismiss the charges based on a violation of his constitutional right to a speedy trial or, in the alternative, to promptly set a trial date. The state trial court held a hearing on May 17 of that year, at which time Langford's counsel raised a similar speedy trial motion. Langford's counsel also asserted that Langford had previously filed a pro se speedy trial motion and requested to "renew that motion." J.A. 467–468.

The prosecutor responded that "the State [had been] prepared to call these two cases for trial today," but Alvin had "reverse[d] his previous decision to testify and cooperate against" Langford and Bryan because they had been "pressuring him not to testify." J.A. 468–470. As a result, the State would first have to try Alvin but could not do so at the current term of court because his new lawyer had been appointed "approximately eight days" earlier and was "not prepared to go forward." J.A. 472. The prosecutor urged that Bryan and Langford should not "be rewarded for" pressuring Alvin not to testify against them. J.A. 470. When defense counsel pointed out that Alvin was housed in a different jail than Bryan and Langford, the prosecutor explained that Alvin had been moved "at the

3

request of local law enforcement" precisely because they "received information from the jail that these two individuals were putting pressure on him not to testify." J.A. 472–473.

The hearing also touched on the difficulty the State had faced in finding an interpreter who was proficient in Mandarin Chinese, the victims' language. The prosecutor explained that the State had resolved the issue and now had an interpreter assisting the State with talking to the victims and also had located an out-of-state court interpreter to appear at trial.

The trial court denied the motions to dismiss but ordered that Langford and Bryan be tried within nine months. The court noted that "the State had gone to a great deal of time and expense in arranging an interpreter for Mandarin Chinese, having to bring the interpreter from another State since none are certified in South Carolina." J.A. 1037. And the court observed that Alvin, the cooperating witness, had changed his mind about testifying "[a]t the last moment," which created issues that required the State to try him before Bryan and Langford. J.A. 1037. Although the court was "deeply concerned about the length of time that these defendants have been incarcerated," it concluded that "[n]one of this delay was occasioned by any impropriety on the part of the State." J.A. 1037; *see also* J.A. 226 ("The State has not been unduly dilatory under the circumstances . . . .").

Langford and Bryan were tried before a South Carolina jury from September 7–9, 2010. The three victims testified through an interpreter. The star witness, however, was Alvin, who had once again decided to cooperate with the State after pleading guilty to armed robbery. Alvin testified in detail about how he, Bryan, and Langford robbed the victims at gunpoint. He admitted to pointing a gun at a victim on the ground and testified

4

that Langford was the one who ran into the house and grabbed the bag of cash. Alvin testified that after the robbery they ran to Bryan's house, where they divvied up the money. After that, Alvin testified, he and Langford went to Alvin's sister's house, where they got in the car with Alvin's sister and mother, who was going to work. He testified that a police officer stopped their car to check identification and ultimately let them go.

On cross-examination by Bryan's counsel, Alvin read two written statements dated January and March 2009 that he had signed. The statements said that Bryan and Langford were not involved in the robbery and that Alvin was not in a "right state of mind" when he had told the police otherwise. J.A. 745. On redirect, Alvin explained that he did not write those statements. Rather, when he and Langford had been held at the same jail pending trial, Langford had given the statements to Alvin and told him to sign them so that "nobody will be in trouble." J.A. 758–759. Alvin testified that the written statements were false and that his testimony in court was true.

The State called two law enforcement witnesses, who corroborated Alvin's testimony and explained the course of the investigation. Officer Zachary Strom testified that immediately after the robbery he set up a perimeter to stop vehicles and seek information about the crime. During that time, he testified, he stopped the car carrying Alvin and Langford but let them go after checking Langford's identification. Investigator Lamaz Robinson explained other details about the investigation, including Alvin's statement to law enforcement implicating himself, Bryan, and Langford. On cross-examination by Bryan's counsel, Investigator Robinson acknowledged that information from Stevens led investigators to Alvin.

5

Langford did not testify or call any witnesses. Bryan did not testify but called one witness, Investigator Young. On direct examination, Investigator Young testified that the investigation into the robbery did not make headway until Stevens, "an acquaintance" of Investigator Young's who was seeking help to resolve a family court bench warrant against himself, called Investigator Young to volunteer information about the robbery. J.A. 851. Investigator Young testified that Stevens gave him three names in connection with the robbery—Alvin, Bryan, and Langford. On cross-examination by Langford's counsel, Investigator Young confirmed that Stevens "had some trouble with the law." J.A. 866.

The jury convicted Langford and Bryan on all charges. The court sentenced them each to twenty years' imprisonment for armed robbery, twenty years for kidnapping, twenty years for first-degree burglary, and five years for conspiracy, all to be served concurrently.

## B.

Langford appealed his convictions to the South Carolina Supreme Court, which affirmed. The court held that South Carolina Code § 1-7-330, which vested state prosecutors with exclusive control over the dockets for general sessions courts, violated the separation of powers provision of the South Carolina Constitution. *Langford*, 735 S.E.2d at 479. But that determination was "not dispositive of Langford's appeal" because he "must demonstrate that he sustained prejudice as a result of the solicitor setting when his case was called for trial." *Id.* The court considered and rejected both forms of prejudice Langford alleged: that he was denied due process because Section 1-7-330 "permitted the solicitor to judge shop," and that he was denied his right to a speedy trial. *Id.*

6

As relevant here, the South Carolina Supreme Court held that the State did not infringe Langford's right to a speedy trial under the Sixth Amendment to the United States Constitution. Applying the framework of *Barker v. Wingo*, 407 U.S. 514 (1972), the court examined the length of the delay, the reasons for it, Langford's assertion of his right, and any prejudice he suffered. *Langford*, 735 S.E.2d at 481–484. Considering these factors and "the case as a whole," the court affirmed the trial court's judgment that Langford was not denied his constitutional right to a speedy trial. *Id.* at 484. The United States Supreme Court denied Langford's petition for a writ of certiorari. *See Langford v. South Carolina*, 571 U.S. 831 (2013).

Langford then filed an application for postconviction relief in the Court of Common Pleas for Edgefield County (the PCR court). Among his asserted grounds for relief, Langford alleged that his trial counsel was constitutionally ineffective for failing to object to hearsay in Investigator Young's testimony about the Stevens tip. After an evidentiary hearing, the PCR court dismissed the application. Applying the framework of *Strickland v. Washington*, 466 U.S. 668 (1984), the PCR court concluded that Langford had not proven his counsel's performance was deficient or that he was prejudiced thereby because Investigator Young's testimony about Stevens's statement was offered for the non-hearsay "'purpose of explaining why a government investigation was undertaken.'" J.A. 1360 (quoting *State v. Brown*, 451 S.E.2d 888, 894 (S.C. 1994)). The South Carolina Court of Appeals denied Langford's petition for certiorari.

Meanwhile, in a separate proceeding, another state court granted postconviction relief to Bryan, Langford's co-defendant. That court found Bryan's counsel

7

constitutionally deficient in three respects, one of which was "fail[ing] to speak with [Investigator] Young before" calling him to testify about Stevens's tip. J.A. 102. The court reasoned that Investigator Young's testimony about Stevens's statement connecting Bryan to the crime was allowed into evidence only because Bryan offered it; if the State had attempted to introduce it, the testimony "would have been double hearsay." J.A. 102. In the court's view, Bryan's counsel should have spoken with Investigator Young before putting him on the stand in order to confirm that the testimony would support counsel's strategy of showing "an ongoing informant" relationship. J.A. 102. The court concluded that counsel's "deficient representation in calling and examining [Investigator] Young" had prejudiced Bryan at trial. J.A. 104.

## C.

Langford then petitioned the federal district court for a writ of habeas corpus, raising eight grounds for relief. A magistrate judge reviewing the petition recommended that the writ be granted on five grounds, and the warden objected to the magistrate judge's report and recommendation. *Langford v. Stonebreaker*, No. 9:20-CV-01298-DCC-MHC, 2024 WL 4309519 (D.S.C. July 31, 2024). The district court ultimately granted the writ on two claims—violation of Langford's speedy trial right and ineffective assistance of counsel. *Langford v. Stonebreaker*, No. 9:20-CV-01298-DCC, 2024 WL 4542342 (D.S.C. Oct. 22, 2024).

The warden appealed to this Court. *See* 28 U.S.C. § 2253(a); Fed. R. App. P. 22(b)(3) ("A certificate of appealability is not required when a state or its representative

8

. . . appeals.")   The district court ordered the State to release Langford from custody pending this appeal.  *See* Fed. R. App. P. 23(c).

## II.

We owe no deference to the district court's decision granting habeas relief.  *Tyler v. Hooks*, 945 F.3d 159, 165 (4th Cir. 2019).  But under the Antiterrorism and Effective Death Penalty Act (AEDPA), we owe "considerable deference" to the decisions of the South Carolina courts resolving Langford's speedy trial and ineffective assistance of counsel claims.  *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).

In AEDPA, Congress has prohibited federal courts from granting habeas relief to state prisoners on the basis of claims previously adjudicated on the merits in state court unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).  A decision may be "contrary to" Supreme Court precedent either because "the state court arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or because "the state court confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at" the opposite result.  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  A state-court decision is an "unreasonable application" of Supreme Court precedent if the state court "correctly identifies the governing legal rule" but "unreasonably applies the law . . . to the facts of a prisoner's case."  *Id.* at 407, 409.  A state court's factual findings must be "presumed . . . correct," and the habeas petitioner

9

bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 524 (4th Cir. 2016).

"In order for a state court's decision to be an unreasonable application of [Supreme Court] case law," as is claimed here, "the ruling must be 'objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (per curiam) (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam)). In other words, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This standard is intentionally "difficult to meet," stopping just "short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id.* at 102; *see Shinn v. Ramirez*, 142 S. Ct. 1718, 1731 (2022) (explaining that habeas corpus "guards only against extreme malfunctions in the state criminal justice systems" (internal quotation marks omitted)).

The district court granted the writ of habeas corpus to Langford based on two federal claims already rejected in state court: (1) violation of Langford's Sixth Amendment right to a speedy trial and (2) ineffective assistance of counsel in failing to object to hearsay testimony by Investigator Young. Both of the district court's rulings were in error, as we will explain.

10

A.

We first address Langford's claim that the 23-month delay between his arrest and trial violated his right to a speedy trial under the Sixth Amendment. There is no dispute that the South Carolina Supreme Court applied the correct legal standard as announced by the United States Supreme Court for analyzing this claim. *See Langford*, 735 S.E.2d at 481–484 (applying *Barker v. Wingo*, 407 U.S. 514 (1972)). The parties instead debate whether the South Carolina Supreme Court unreasonably applied that clearly established law to the facts of this case.

"[E]valuating whether a rule application was unreasonable requires considering the rule's specificity." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* As relevant here, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. In *Barker*, the Supreme Court explained that the right to a speedy trial "is a more vague concept than other procedural rights." 407 U.S. at 521. It is "impossible to determine with precision when the right has been denied," and so "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Id.* at 521–522. Accordingly, the Supreme Court rejected a bright-line rule for speedy trial claims and instead adopted a balancing test that "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis." *Id.* at 530. The Court identified four relevant factors for courts to assess: the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* However, "none of

11

the four factors" is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Id.* at 533. Rather, they "must be considered together with such other circumstances as may be relevant" in the court's "difficult and sensitive balancing process." *Id.*

*Barker* undoubtedly articulated a "general standard" that "demand[s] a substantial element of judgment" as applied "to a specific case." *Yarborough*, 541 U.S. at 664. For that reason, when we review a state court's application of the *Barker* factors to a particular case, the "'always-substantial deference' we afford to state courts in federal habeas review 'is at an apex.'" *Russell v. Denmark*, 68 F.4th 252, 262 (5th Cir. 2023) (quoting *Amos v. Thornton*, 646 F.3d 199, 205 (5th Cir. 2011)). "Section 2254(d)(1) thus requires us to give the widest of latitude to a state court's conduct of its speedy-trial analysis." *Amos*, 646 F.3d at 205.

With this deference in mind, we turn to the South Carolina Supreme Court's analysis of Langford's speedy trial claim. Applying the first *Barker* factor, the length of delay, the court determined that the relevant period began with Langford's arrest on October 3, 2008, and ran until his trial commenced 23 months later on September 7, 2010—a "length of time [that] is presumptively prejudicial and triggers the remaining *Barker* inquiry." *Langford*, 735 S.E.2d at 482 (citing *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)).

12

The court then addressed the second factor, the reason for the delay. It found that the first twenty-month delay[1] was attributable to the State's difficulty in finding an interpreter to facilitate any "'meaningful' conversation with the victims." *Id.* at 483. Although the court was not convinced the State had used its "best efforts" to obtain an interpreter, it saw "no evidence that [the State] had intentionally tarried in finding one." *Id.* "At most," the court concluded, "the State was negligent," which was a "neutral reason" for the delay that did "not weigh heavily against" the State. *Id.* (citing *Barker*, 407 U.S. at 531). As for the final four-month delay, the court "review[ed] . . . the record" and found "evidence that Langford and his co-defendant persuaded [Alvin] Phillips to remain silent," which "effectively gutted the State's case on the day of trial" and required the State to proceed against Alvin first. *Id.* But Alvin's attorney "was not ready to proceed during that term of court," and thereafter "the State moved with reasonable haste." *Id.* The court determined that the four-month delay did not "count . . . against the State" because it was "the product of Langford's efforts to spoil the State's evidence" by "tampering with the State's star witness." *Id.* at 483 & n.9 (citing *United States v. Loud Hawk*, 474 U.S. 302, 316 (1986)).

---

[1] Nineteen and one-half months passed between Langford's arrest on October 3, 2008, and the speedy trial hearing on May 17, 2010. Three and one-half months passed between the May 17, 2010, hearing and the commencement of trial on September 7, 2010, for a total delay of about 23 months between Langford's arrest and his trial. For simplicity, we follow the South Carolina Supreme Court's approximation of these two delays as twenty months and four months respectively.

13

Moving to the third *Barker* factor, the defendant's assertion of his right, the court accepted that Langford "filed what seems to be a *pro se* speedy trial motion in June 2009." *Id.* at 483. But the court observed that he did not seek a ruling on the motion "until the May 2010 hearing" at which his counsel adopted the motion, after the initial twenty-month delay. *Id.* The court further observed that "it may have been futile for [Langford] to raise the issue again" after the trial court's May 2010 ruling but nevertheless noted that "'failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.'" *Id.* at 483–484 (quoting *Barker*, 407 U.S. at 532).

Finally, the court addressed the prejudice to Langford, which is the fourth *Barker* factor. *Id.* at 484. It considered prejudice from "oppressive pre-trial incarceration," "anxiety stemming from being publicly accused of a crime," and the possibility that the "defense will be impaired," of which the last is "'the most serious.'" *Id.* (quoting *Barker*, 407 U.S. at 532). The court found no evidence "of anxiety caused by the stigma of being accused of these crimes," and while it acknowledged "the deleterious effects of lengthy pre-trial incarceration," the court concluded that the delay here did "not amount to a constitutional violation in the absence of any actual prejudice to Langford's case." *Id.* Regarding prejudice to his case, the court held that "Langford ha[d] not demonstrated how his own defense was prejudiced by the delay." *Id.* Although the final four-month delay allowed the State to once again secure Alvin's testimony for trial, the court explained that "the State only had to do so because of [Langford's] interference." *Id.* Considering all the factors "and the case as a whole," the court affirmed the trial court's finding that Langford was not denied a speedy trial. *Id.*

14

The South Carolina Supreme Court's application of *Barker* to the facts of this case was not so lacking in justification that "every fairminded jurist would disagree" with it. *Klein v. Martin*, 146 S. Ct. 589, 596 (2026) (internal quotation marks omitted). The parties dispute the second and fourth *Barker* factors, which arguably drove the court's analysis; but the court's assessment of those factors was not unreasonable, that is, "beyond any possibility for fairminded disagreement."[2] *Richter*, 562 U.S. at 103. Regarding the reason for the delay, the court found that the State was not intentionally dilatory and that the final four-month delay was the product of Langford's efforts to spoil the State's evidence. In those circumstances, it was not unreasonable for the court not to weigh this factor dispositively against the State. *See Vermont v. Brillon*, 556 U.S. 81, 90 (2009) ("[D]elay caused by the defense weighs against the defendant."); *Loud Hawk*, 474 U.S. at 316 (holding that a defendant who causes delays in his trial "should not be able . . . to reap the reward of dismissal for failure to receive a speedy trial"); *Barker*, 407 U.S. at 531 (characterizing government "negligence" as a "more neutral reason" for delay that "should be weighted less heavily"). And given the absence of any evidence of prejudice to Langford from the delay—apart from the time necessary to undo the prejudice that he had

---

[2] Langford contends that the warden waived certain arguments by failing to object to specific parts of the magistrate judge's report and recommendation. However, the warden did object to the magistrate judge's *Barker* analysis, focusing on the reasons for the delay and prejudice to the defense. *See United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007) ("[T]o preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection."). Even assuming the warden waived objections to other points in the speedy trial analysis, he did not waive his arguments regarding the second and fourth *Barker* factors.

15

caused to the State's case by tampering with Alvin—the court's weighing of the fourth *Barker* factor also was not unreasonable. *See Barker*, 407 U.S. at 532. Because fairminded jurists could disagree about how to weigh the lack of prejudice and reasons for the delay among the other *Barker* factors in the context of this case, the South Carolina Supreme Court's decision that the 23-month delay did not violate Langford's Sixth Amendment right to a speedy trial was not "an unreasonable application of . . . clearly established Federal law." 28 U.S.C. § 2254(d)(1).

Langford attempts to impugn the South Carolina Supreme Court's factual determinations, but his effort is unconvincing. Although he criticizes the court's findings regarding the reasons for the twenty-month and four-month delays, he has not identified "clear and convincing evidence" rebutting the presumption that those findings are correct. 28 U.S.C. § 2254(e)(1).

Regarding the twenty-month delay, which the South Carolina Supreme Court found was attributable to negligence at most, Langford parrots the magistrate judge's critique that the court "ignore[d] the underlying reason" for the State's negligence, namely that "the [prosecutor] controlled the criminal trial docket at that time." *Langford*, 2024 WL 4309519, at *15. According to the magistrate judge, the court's supposed failure to "consider the State's control of the docket—a power of control that violated the state constitution—as a part of its speedy trial analysis under *Barker* was unreasonable." *Id.* That conclusion misreads the South Carolina Supreme Court's opinion and misconceives AEDPA's standard of review. The first half of the court's opinion analyzed South Carolina's docket-control statute and held that it was unconstitutional. *Langford*, 735

16

S.E.2d at 477–479.  The court then proceeded to analyze whether Langford suffered any prejudice "as a result of" the prosecutor unconstitutionally possessing that authority in Langford's case.  *Id.* at 479.  The entire speedy trial analysis occurred in the context of assessing whether the prosecutor's control over the docket prejudiced Langford.  Far from ignoring the issue, the court considered the prosecutor's docket control and scrutinized the State's reasons for how it exercised that control in this case.  In any event, this line of argument identifies only the *opportunity* for a prosecutor to intentionally delay.  Langford has not supplied the clear and convincing evidence necessary to rebut the South Carolina Supreme Court's presumptively correct finding that the prosecutor *in this case* was, at most, merely negligent.  *See* 28 U.S.C. § 2254(e)(1).

As for the four-month delay, Langford similarly fails to make the required showing. The South Carolina Supreme Court, based on its "review of the record" before it, determined that the four-month delay was "the product of Langford's efforts" to persuade Alvin not to testify.  *Langford*, 735 S.E.2d at 483; *see also id.* at 484.  That record included the trial court's findings on the motion to dismiss and the transcript of the motion-to-dismiss hearing, where counsel explained that law enforcement moved Alvin to a different prison after discovering that Langford and Bryan were pressuring him not to testify.  It included Alvin's signed statements retracting the portions of his original statement to police that implicated his co-conspirators.  It included Alvin's trial testimony that the retracting statements were false and written by Langford, who told him to sign them so no one would be in trouble.  And it included trial testimony from Investigator Young that he moved Alvin to a different jail based on tips that "he was being intimidated and influenced

17

into not testifying against his co-defendants." J.A. 865 ("He was the only one cooperating at the time and he was the youngest and . . . vulnerable[] . . . ."). This "evidence presented in the State court proceeding" supported the South Carolina Supreme Court's determination that Langford caused the additional four-month delay. 28 U.S.C. § 2254(d)(2). But more importantly, under AEDPA the burden was on Langford to rebut the state court's factual findings by clear and convincing evidence—not, as Langford would have it, on the State to prove that those findings were supported. *See* 28 U.S.C. § 2254(e)(1). Langford has not carried his burden.

Viewed with the deference AEDPA demands, the South Carolina Supreme Court's decision was not an unreasonable application of the United States Supreme Court's speedy trial precedents nor based on an unreasonable determination of the facts in light of the evidence presented in state court. Langford's speedy trial claim, therefore, cannot be the basis for a writ of habeas corpus. 28 U.S.C. § 2254(d).

## B.

We turn now to Langford's second claim for habeas relief: ineffective assistance of counsel. In Langford's view, Investigator Young's testimony that Stevens gave him three names—Alvin, Bryan, and Langford—was hearsay and violated the Confrontation Clause of the Sixth Amendment to the United States Constitution. Langford claims that his attorney should have objected to this testimony and that failure to do so was such a serious error that his attorney was no longer "functioning as the 'counsel' guaranteed . . . by the Sixth Amendment" and the result of his trial is not reliable. *Strickland*, 466 U.S. at 687; *see* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right

18

. . . to have the Assistance of Counsel for his defense."). The state PCR court considered and rejected this claim.

The requirements for proving ineffective assistance of counsel are articulated in *Strickland v. Washington*. First, a defendant must show that counsel's performance "fell below an objective standard of reasonableness." 466 U.S. at 688. When reviewing counsel's performance, a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. That presumption requires us "not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (alteration and internal quotation marks omitted). Second, a defendant must show that "there is a reasonable probability that . . . the result of the proceeding would have been different" absent counsel's deficiencies. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 563 U.S. at 189 (quoting *Richter*, 562 U.S. at 112).

AEDPA requires that we review Langford's *Strickland* claim through "an additional layer" of deference. *Owens v. Stirling*, 967 F.3d 396, 411 (4th Cir. 2020). Applying the "highly deferential" standards of AEDPA and *Strickland* in tandem, our question "is not whether counsel's actions were reasonable" but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105 (internal quotation marks omitted). Like the speedy trial standard discussed above, "'the *Strickland*

19

standard is a general standard'"; therefore, "'a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.'" *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). Thus, while "'[s]urmounting *Strickland*'s high bar is never an easy task,' it is 'all the more difficult' to establish 'that a state court's application of *Strickland* was unreasonable . . . under § 2254(d).'" *Owens*, 967 F.3d at 411 (alterations in original) (quoting *Morva v. Zook*, 821 F.3d 517, 528 (4th Cir. 2016)).

Applying *Strickland*, the PCR court held that Langford had failed to prove counsel's performance was deficient or that he was prejudiced thereby because Investigator Young's testimony was not hearsay. As the PCR court explained, Langford's co-defendant Bryan elicited Investigator Young's testimony "to present the jury information about how the investigation ended up focusing on [the defendants]," in particular, "to show [that] an alleged informant who had a pending legal problem called [Investigator Young] and offered information on [Langford] and his co-defendants." J.A. 1360. Quoting a decision of the South Carolina Supreme Court, the PCR court reasoned that "'an out of court statement is not hearsay if it is offered for the limited purpose of explaining why a government investigation was undertaken.'" J.A. 1360 (alteration omitted) (quoting *Brown*, 451 S.E.2d at 894). Because Bryan introduced Investigator Young's testimony about Stevens's statement for that purpose, it was not hearsay and therefore not objectionable on that ground.

The PCR court's decision was not an unreasonable application of *Strickland*, for multiple independent reasons. To begin with, whether the relevant portion of Investigator

20

Young's testimony was hearsay is not beyond any possibility of fairminded disagreement. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." S.C. R. Evid. 801(c). An out-of-court statement that is not offered for the truth but instead for the limited purpose of explaining why a government investigation was undertaken is not hearsay. *Brown*, 451 S.E.2d at 894. Investigator Young testified that the robbery investigation did not make headway for weeks until Stevens, an acquaintance with a bench warrant, called him out of the blue and volunteered the suspects' names. That testimony was not solicited by the State but by Langford's co-defendant in an effort to show that police focused on the defendants only because of an unsolicited tip from an informant with something to gain by currying favor with law enforcement. It is not beyond the realm of reasonable disagreement to conclude, as the PCR court did, that Bryan's counsel offered the testimony not for the truth of Stevens's tip but rather to cast doubt on the veracity of the tip and the integrity of the investigation as a whole.

Even if the testimony was hearsay, a court could reasonably conclude that counsel's decision not to object nevertheless fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see Pinholster*, 563 U.S. at 196 (requiring courts to "affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did" (internal quotation marks omitted)). This is an "objective" inquiry that does not depend on counsel's "subjective state of mind." *Richter*, 562 U.S. at 110. Langford's counsel could have reasonably expected that Bryan's attorney was not eliciting the testimony for the truth of Stevens's accusation, because such a use would implicate his

21

own client (along with Langford). Counsel could have strategically withheld an objection to avoid thwarting a co-defendant's attempt to cast doubt on the State's investigation, even if a step in that line of questioning elicited potentially damaging hearsay. Counsel could have reasonably thought that giving the jury a reason to question the informant's reliability was a decent way to create reasonable doubt, even at the price of revealing the informant's accusation. Indeed, Langford's attorney furthered this defense theory on cross-examination by confirming with Investigator Young that Stevens had "had some trouble with the law." J.A. 866. Because there is at least a "reasonable argument that counsel satisfied *Strickland*'s deferential standard," the PCR court's conclusion that counsel was not deficient cannot be unreasonable. *Richter*, 562 U.S. at 105; *see also Valentino v. Clarke*, 972 F.3d 560, 581 (4th Cir. 2020) (petitioner must show "that no fair-minded jurist could find one of those reasons to be sound trial strategy").

Moreover, even if the testimony was hearsay and competent counsel would have objected, resulting in exclusion of the evidence, fairminded jurists could still disagree about whether Langford's claim fails on *Strickland*'s prejudice prong. In making this determination, a court "must consider the totality of the evidence before the . . . jury." *Strickland*, 466 U.S. at 695. As the South Carolina courts recognized, the State's "star witness" was Alvin, and the verdict depended largely on whether the jury believed him. *Langford*, 735 S.E.2d at 483 n.9. Alvin admitted his own significant role in the armed robbery and testified in detail about Langford's participation with him in the crime. Among other things, Alvin testified that Langford participated in holding the victims at gunpoint, that Langford stole the bag of cash from inside the home, and that Langford took a portion

22

of the money for himself. Other evidence corroborated Alvin's account. The victims' testimony was consistent with his version of events. And Officer Strom corroborated Alvin's testimony that immediately following the robbery, he rode in a car with his sister, his mother, and Langford, and that an officer stopped the car to check Langford's identification. Further, the jury already knew from Investigator Robinson's testimony that Stevens's tip had led investigators to interview Alvin. Langford's only contention is that, had counsel objected, the trial court would have excluded Investigator Young's testimony that Stevens's tip named Alvin, Bryan, and Langford. Considering the totality of the evidence, however, it was not "necessarily unreasonable" for the PCR court to conclude that Langford "had failed to show a 'substantial' likelihood" that the jury would have returned a different verdict had Investigator Young's testimony been excluded. *Pinholster*, 563 U.S. at 202 (quoting *Richter*, 562 U.S. at 112); *see also Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021).

Langford's arguments to the contrary are unpersuasive. Like the district court and the magistrate judge, he calls Investigator Young's testimony "double hearsay" without any analysis. That characterization comes from the state court that considered co-defendant Bryan's application for postconviction relief. The court there remarked that, had *the State* offered the testimony, it "would have been double hearsay," but it "was allowed in evidence only because [Bryan's counsel] offered it."[3] J.A. 102. That observation says

---

[3] Investigator Young reporting Stevens's out-of-court statement would be one layer of hearsay if offered for the truth of the matter asserted. The trial evidence did not suggest a second layer of hearsay, although in this Court the parties speculate that Stevens received his information from another person.

nothing about whether the testimony, as actually presented at trial, was hearsay, much less whether Langford's counsel was constitutionally deficient for not objecting to it. And it does not disturb the conclusion that fairminded jurists could disagree on all of this, which is the determinative question for AEDPA purposes.

Langford also argues that, in all this talk about hearsay, the warden managed to waive any response to Langford's claim that Investigator Young's testimony was also objectionable as a Confrontation Clause violation. Not so. The warden has consistently asserted that "there were no grounds to object" to the testimony at trial because it was not offered for the truth. J.A. 2055. That summarizes the warden's argument as to hearsay and the Confrontation Clause, because a statement "'must be hearsay ('for the truth')'" to implicate the Confrontation Clause at all. *United States v. Seward*, 135 F.4th 161, 169 (4th Cir. 2025) (quoting *Smith v. Arizona*, 144 S. Ct. 1785, 1801 (2024)); *see Smith*, 144 S. Ct. at 1792 ("The Clause's prohibition applies only to testimonial hearsay." (internal quotation marks omitted)). "When a statement is admitted for a reason unrelated to its truth, . . . the Clause[] . . . is not implicated." *Smith*, 144 S. Ct. at 1792. The warden's hearsay-based response preserved his Confrontation Clause argument too. And all of our conclusions about a hearsay objection apply equally to an objection on Confrontation Clause grounds. It was not unreasonable for the PCR court to find that Langford had not proven ineffective assistance of counsel in either regard.

The district court reached a contrary conclusion by proceeding "in a manner fundamentally inconsistent with AEDPA." *Kayer*, 141 S. Ct. at 523. The district court reasoned that Investigator Young's testimony about Stevens's tip was in fact hearsay and

24

a Confrontation Clause violation, "[t]herefore, the PCR court's holding" that trial counsel was not ineffective for failing to object "is unreasonable." *Langford*, 2024 WL 4542342, at \*12; *see also Langford*, 2024 WL 4309519, at \*26. Likewise with prejudice: the district court determined for itself that "the statements were prejudicial" and so "granted [the petition] as to this Ground," without bothering to ask whether any fairminded jurist could disagree with that conclusion. *Langford*, 2024 WL 4542342, at \*13; *see also Langford*, 2024 WL 4309519, at \*26.

The United States Supreme Court has repeatedly admonished federal courts for this practice of "'essentially evaluat[ing] the merits *de novo*, only tacking on a perfunctory statement at the end of [their] analysis asserting that the state court's decision was unreasonable.'" *Kayer*, 141 S. Ct. at 523 (quoting *Sexton v. Beaudreaux*, 585 U.S. 961, 968 (2018) (per curiam)); *see also Richter*, 562 U.S. at 102–103 ("[H]abeas corpus is . . . not a substitute for ordinary error correction through appeal."). We reiterate: "All that matter[s]" for AEDPA review of a *Strickland* claim is "whether the [state] court, notwithstanding its substantial 'latitude to reasonably determine that a defendant has not [satisfied *Strickland*'s standard],' still managed to blunder so badly that every fairminded jurist would disagree." *Hines*, 141 S. Ct. at 1149 (quoting *Mirzayance*, 556 U.S. at 123). Because the PCR court did not, its decision was not unreasonable. Therefore, habeas corpus relief may "not be granted with respect to" Langford's ineffective assistance of counsel claim. 28 U.S.C. § 2254(d).

25

III.

The district court erred in granting Langford the writ of habeas corpus on his speedy trial claim and his ineffective assistance of counsel claim.   South Carolina courts adjudicated both of those claims on the merits, and their decisions did not involve an unreasonable application of federal law or an unreasonable determination of the facts. Accordingly, the district court's order granting the writ of habeas corpus is reversed.

*REVERSED*